# ENTITLEMENT TO RESERVIST DIFFERENTIAL PAY UNDER THE PRE-AMENDMENT VERSION OF 5 U.S.C. § 5538

*Under the pre-amendment version of 5 U.S.C. § 5538, covered employees may receive reservist differential pay not only for pay periods that occur when they are serving on active duty, but also for those pay periods that fall within the additional period in which they have re-employment rights following the completion of that duty.*

June 28, 2010

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL
## UNITED STATES OFFICE OF PERSONNEL MANAGEMENT

You have asked for our views on how to interpret the pre-amendment version of 5 U.S.C. § 5538, a law that provides a monetary payment to qualifying federal employees who are called to active duty from the military reserves.[1] Under section 5538, reservists who take a leave of absence from federal civilian employment "in order to perform active duty in the uniformed services pursuant to a call or order to active duty" under certain statutory authorities are entitled to additional compensation for pay periods in which their military pay would be less than their basic civilian pay. Section 5538 thus ensures that such reservists do not experience a pay cut because of a call to active duty. You have asked whether the pay periods during which eligible federal employees are entitled to receive this additional compensation, commonly known as "reservist differential pay," include only those that occur within the period of active duty, or whether they also include those pay periods that fall within the additional period of time, specified by 38 U.S.C. § 4312, in which a returning reservist is generally entitled to report for re-employment at his or her civilian workplace. We conclude that under the pre-amendment statute, covered employees may receive reservist differential pay not only for pay periods that occur when they are serving on active duty, but also for those pay periods that fall within the additional period in which they have re-employment rights following the completion of that duty. 5 U.S.C. § 5538(b)(2)(B).[2]

---

[1] In addition to the views we received from the Office of Personnel Management, we also solicited and received the views of the Department of Defense ("DoD"). *See* Memorandum for David Barron, Acting Assistant Attorney General, from Elaine D. Kaplan, General Counsel, Office of Personnel Management ("OPM"), *Re: Request for OLC Opinion Regarding Entitlement to Payment of the Reservist Differential Under 5 U.S.C. § 5538 During Periods of Time After Active Duty Ends, and During Which an Employee is Entitled to Reemployment Rights under the Uniformed Services Employment and Reemployment Rights Act* (Nov. 19, 2009) ("OPM Letter"); Email for Jeannie Rhee, Deputy Assistant Attorney General, Office of Legal Counsel, from James Smyser, Associate Deputy General Counsel, Department of Defense, *FW: Opinion Request from OPM on interpretation of 5 USC 5538 (Reservist Differential Pay)* (Feb. 4, 2010) ("DoD Letter").

[2] In December 2009, Congress amended section 5538 in a manner that OPM and DoD believe makes clear "that the reservist differential is not payable for periods following completion of active duty." *See* http://www.opm.gov/reservist/guidance/qualifying.asp; *see also* Pub. L. No. 111-117, div. C., tit. VII, § 745(a), 123 Stat. 3219 (Dec. 16, 2009). We express no opinion on that interpretation, although we note that section 5538 gives OPM, "in consultation with [the] Secretary of Defense," the discretion to "prescribe any regulations necessary to carry out the preceding provisions of this section." 5 U.S.C. § 5538(d).

**I.**

First enacted on March 11, 2009, *see* Pub.L. 111-8, div. D, tit. VII, § 751(a), 123 Stat. 693, 5 U.S.C. § 5538 contains three provisions relevant to your question. The first, subsection (a), describes the requirements a Federal employee must meet to be eligible for reservist differential pay and sets forth the method for calculating the amount:

> (a) An employee who is absent from a position of employment with the Federal Government in order to perform active duty in the uniformed services pursuant to a call or order to active duty under a provision of law referred to in section 101(a)(13)(B) of title 10[3] *shall be entitled, while serving on active duty, to receive, for each pay period described in subsection (b)*, an amount equal to the amount by which—
>
>> (1) the amount of basic pay which would otherwise have been payable to such employee for such pay period if such employee's civilian employment with the Government had not been interrupted by that service, exceeds (if at all)
>>
>> (2) the amount of pay and allowances which (as determined under subsection (d))—
>>
>> (A) is payable to such employee for that service; and
>>
>> (B) is allocable to such pay period.

5 U.S.C. § 5538(a) (emphasis added).

Second, subsection (b)(1) describes the "pay period[s]" referenced in subsection (a) during which an eligible employee is entitled to receive reservist differential payments:

> (b)   (1) Amounts under this section shall be payable with respect to each pay period (which would otherwise apply if the employee's civilian employment had not been interrupted)—
>
>> (A) during which such employee is entitled to reemployment rights under chapter 43 of title 38 with respect to the position from which such employee is absent (as referred to in subsection (a)); and
>>
>> (B) for which such employee does not otherwise receive basic pay (including by taking any annual, military, or other paid leave) to

---

[3]  As an OPM guidance document explains, section 101(a)(13)(B) references "specific provisions in title 10 of the United States Code" which function as "authorities for certain military contingency operations for which a reservist (*i.e.*, member of a Reserve component or the National Guard) may be called or ordered to active duty." *See* http://www.opm.gov/reservist/guidance/appendixd.asp.

> which such employee is entitled by virtue of such employee's
> civilian employment with the Government.

5 U.S.C. § 5538(b)(1).

      Third, as originally enacted, subsection (b) also contained an additional provision, (b)(2), that provided a further gloss on the period during which an employee would be "entitled to reemployment rights under chapter 43 of title 38":

> (2) For purposes of this section, the period during which an employee is
> entitled to reemployment rights under chapter 43 of title 38—
>
> > (A) shall be determined disregarding the provisions of section
> > 4312(d) of title 38;[4] and
> >
> > (B) *shall include any period of time specified in section 4312(e) of
> > title 38 within which an employee may report or apply for
> > employment or reemployment following completion of service on
> > active duty to which called or ordered as described in subsection
> > (a).*

5 U.S.C. § 5538(b)(2) (emphasis added).

      Subsection 5538(b)'s references to "chapter 43 of title 38" are to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4335 (2006 & West Supp. 2010).[5] Among other things, USERRA broadly requires an employer to promptly reemploy a returning reservist to "the position for which qualified that he or she would have attained if continuously employed," or, in the case of active service periods lasting 91 days or more, "a position of like seniority, status, and pay." 5 C.F.R. § 353.207 (2009); *see* 38 U.S.C. § 4312. To take advantage of this entitlement, an employee must timely report for work or submit an application for reemployment "upon the completion of a period of service in the uniformed services" and by a statutorily prescribed deadline. 38 U.S.C. § 4312(e)(1). Persons "whose period of service in the uniformed services was less than 31 days" must report to their employer on the first work day following completion of their service, a period allowing for safe travel back to their residence, and an additional "eight hours." *Id*. at (e)(1)(A)(i). Those who

---

[4] Subsection 4312(d) excuses employers from their reemployment obligations when they are able to demonstrate: (1) "the employer's circumstances have so changed as to make such reemployment impossible or unreasonable"; (2) "such employment would impose an undue hardship on the employer"; or (3) the reservist was employed for "a brief, nonrecurrent period" prior to active service and "there is no reasonable expectation that such employment will continue indefinitely or for a significant period." 38 U.S.C. § 4312(d)(1).

[5] USERRA's general purposes are: "(1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service; (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a) (2006).

serve for "more than 30 days but less than 181 days" must submit an "application for reemployment . . . not later than 14 days after the completion" of their service. *Id*. at (e)(1)(C). And those who serve for "more than 180 days" must submit an application for reemployment "not later than 90 days after the completion" of their service. *Id*. at (e)(1)(D).[6]

## II.

Your question regarding the duration of a federal employee's entitlement to "reservist differential pay" arises because two provisions of the original statutory text could be read to give conflicting indications as to how long that entitlement was intended to last. On the one hand, subsection 5538(a) declared that eligible employees are "entitled, *while serving on active duty*, to receive, for each pay period described in subsection (b)," reservist differential pay—a provision that, at least in isolation, seemed to indicate that employees would be entitled to receive such pay only "while serving on active duty." 5 U.S.C. § 5538(a) (emphasis added). On the other hand, subsection 5538(b)—which described the pay periods during which an employee is entitled to receive reservist differential pay—provided that the "period . . . during which such employee is entitled to" differential pay "shall include any period of time . . . within which an employee may report or apply for employment or reemployment *following completion of service on active duty*." 5 U.S.C. § 5538(b)(1)(A) & (2)(B) (emphasis added). In contrast to subsection 5538(a), subsection (b)(2)(B) appeared to contemplate that an eligible employee could receive differential pay during periods that "follow[] completion of service on active duty."

In the time since we received your opinion request, Congress has amended section 5538 by, in effect, deleting subsection (b)(2). *See* Pub. L. No. 111-117, div. C., tit. VII, § 745(a), 123 Stat. 3219 (Dec. 16, 2009)("Consolidated Appropriations Act, 2010") (deleting the original subsection (b) and inserting in its place a new subsection (b) that contains all of the language of former paragraph (b)(1) and none of the language of former paragraph (b)(2)). The conference report termed this change a "technical correction" to section 5538, but did not otherwise discuss the intended purpose or import of this amendment. *See* H.R. Conf. Rep. No. 111-366, at 946 (2009). As we understand it, OPM and DoD agree that this amendment "clarif[ies] that the reservist differential is not payable for periods following completion of active duty." *See* http://www.opm.gov/reservist/guidance/qualifying.asp. However, your opinion request remains outstanding, in light of continued disagreement regarding the proper interpretation of the original statute, as it applies to those who served on active duty and were entitled to reemployment rights during the pre-amendment period.

---

[6] These deadlines are extended in the case of "[a] person who is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, the performance of service in the uniformed services." 38 U.S.C. § 4312(e)(2)(A). Such a person may report or apply for reemployment after recovering from the illness or injury. This recovery period is limited to two years, except where reporting for reemployment within that period is made impossible or unreasonable by circumstances beyond the person's control. *Id.*

**A.**

The principle that "[a] statute should be construed so that effect is given to all its provisions so that no part will be inoperative or superfluous, void or insignificant" is "one of the most basic interpretive canons." *Corley v. United States*, 129 S. Ct. 1558, 1566 (2009). *See also*, *e.g.*, *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004) ("It is . . . a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted)); *Market Co. v. Hoffman*, 101 U.S. 112, 115-16 (1879) ("a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant"); *Carcieri v. Salazar*, 129 S. Ct. 1058, 1066 (2009) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("we are obliged to give effect, if possible, to every word Congress used"). When presented with provisions that appear to be in conflict, we must therefore endeavor to reconcile those provisions by adopting a construction that refrains from treating any provision as void or meaningless, in accordance with the maxim that "[t]he cardinal principle of statutory construction is to save and not to destroy." *United States v. Menasche*, 348 U.S. 528, 538-39 (1955); *see also Moskal v. United States*, 498 U.S. 103, 109 (1990) (rejecting proposed construction that would fail to give meaning to certain statutory language because such a reading would "violate[] the established principle that a court should give effect, if possible, to every clause and word of a statute") (quotation marks omitted); *Hoffman*, 101 U.S. at 116 ("every part of a statute must be construed in connection with the whole, so as to make all the parts harmonize, if possible, and give meaning to each"); Norman J. Singer, 2A Sutherland Statutes and Statutory Construction § 46.6 (7th ed. 2007) ("Singer, Statutory Construction") ("No clause, sentence or word shall be construed as superfluous, void or insignificant if a construction can be found which will give force to and preserve all the words of the statute.").

It is clearly possible to read subsection (a)'s "while serving on active duty" provision, at least in isolation, to permit employees to receive reservist differential pay only for pay periods that occur within the period of active duty. However, adopting this reading of subsection (a) would deprive a substantial part of subsection (b) of meaning, since the latter provision states that such pay "shall by payable with respect to each pay period . . . during which such employee is entitled to re-employment rights under chapter 43 of title 38," (5 U.S.C. § 5538(b)(1)), a category that is then expressly defined to include the time "*following* completion of service on active duty." 5 U.S.C. § 5538(b)(2)(B) (emphasis added). Reading subsection (a) as controlling the meaning of section 5538 in this way thus would effectively read subsection (b)(2)(B) out of the statute and produce a reading that contradicts its plain language—a result that would be difficult to square with the statutory construction principles we have just described. *See* 2A Singer, Statutory Construction § 46:6 ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error."); *Menasche,* 348 U.S. at 538-39 ("It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section") (quotation marks omitted). Reading subsection (a) in this manner would also introduce an internal tension in subsection (a) itself: subsection (a) states that eligible employees "shall be entitled" to receive reservist

differential pay "for each pay period described in subsection (b)," but on this interpretation of section 5538, such employees in fact would *not* be entitled to receive differential pay for each pay period described in subsection (b)—they would not receive such pay for the periods "following completion of service on active duty" described in subsection (b)(2)(B).

In view of these difficulties, we believe subsection (a) should not be read as restricting reservist differential pay to those periods during which a reservist is actually serving on active duty if another plausible reading of the statute is available. And here, we think such a reading is available: it is also possible to read subsection (a)'s phrase "entitled, while serving on active duty, to receive" reservist differential pay to mean that an employee's entitlement to receive such pay accrues and vests during his or her service on active duty. On this reading, the employee accrues the "entitle[ment]" to receive reservist differential pay during "each pay period described in subsection (b)" by virtue of service on active duty. However, the duration of the entitlement that would thereby vest, on this reading, would not be limited solely to the term of active service, but would also encompass "each pay period described in subsection (b)," including those periods that "follow[] completion of service on active duty." This reading harmonizes subsection (a) and subsection (b)(2)(B), avoiding the apparent conflict that would arise from the narrower reading of subsection (a) discussed above.

In addition to avoiding any apparent conflict with subsection (b), this reading gives distinct meaning to each of the references in subsection (a) to "active duty." The first part of subsection (a) states that the entitlement to reservist differential pay applies to employees who are absent from federal employment "in order to perform active duty in the uniformed services pursuant to a call or order to active duty" under certain specified statutory provisions. This language makes clear that an employee qualifies for reservist differential pay only if he or she is absent for the purpose of serving on active duty, as opposed to other forms of service, and only if that service on active duty is pursuant to a call or order under one of the referenced statutory provisions.[7] Subsection (a) then refers to "active duty" a second time, in the provision at issue here, stating that an eligible employee "shall be entitled, while serving on active duty, to receive" reservist differential pay. On the reading proposed here, this second reference to "active duty" clarifies that the right to reservist pay accrues and vests only if the employee actually performs active duty.

It is true that the word "while" suggests a bounded duration, circumscribed by the time period or event to which it refers, rather than an open-ended period initiated by that time period or event. *See* Merriam-Webster's Third New International Dictionary, Unabridged Edition, 2604 (1993) (defining "while," when used as a conjunction in similar contexts, to mean "during the time that," "until the end of the time that," or "during which time"). And on our reading, the period in which an employee would receive reservist differential pay would not be confined to the bounded duration of the employee's period of active service. However, our reading is

---

[7] Reemployment rights under Chapter 43 apply to persons "whose absence from a position of employment is necessitated by reason of service in the uniformed services." 38 U.S.C. § 4312(a). The term "service in the uniformed services," in turn, is defined as "the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, a period for which a person is absent . . . for the purpose of an examination to determine the fitness of the person to perform any such duty, and a period for which a person is absent . . . for the purpose of performing funeral honors duty." 38 U.S.C. § 4303(13).

nonetheless consistent with understanding the word "while" to connote a circumscribed duration, because the employee's receipt of reservist differential pay would be defined, in two distinct but related respects, by the period of time that the employee spends in active service. First, during each day of active duty—*i.e.*, "while serving on active duty"—an eligible employee is entitled to reservist differential pay that corresponds to that day. Second, and simultaneously, each day of active duty counts towards the total length of service that determines, in turn, the period following the completion of active duty during which the employee is entitled to reemployment rights and, consequently, reservist differential pay. *See* 5 U.S.C. § 5538(b)(2)(B).

We therefore do not believe that section 5538 presents the rare circumstance in which it is necessary to resort to the "elimination of words" in order to "give [an] act meaning, effect or intelligibility" or "avoid inconsistencies and to make the provisions of the act harmonize." 2A Singer, Statutory Construction § 47:37. As we have explained above, consistent with the view expressed by OPM, we believe there is a reading of the statute that is permissible and gives meaning to all its provisions. As such, we do not face a circumstance comparable to that at issue in *Chickasaw Nation v. United States*, 534 U.S. 84 (2001), where the Supreme Court adopted a construction of a federal statute that concededly "deprive[d] the words 'chapter 35' of any effect," *id.* at 93. The unusual circumstances of that case compelled the Court to conclude, after applying ordinary tools of statutory construction, that "no other reasonable reading of the statute" was available. *Id.* at 89. Moreover, the language the Court deprived of meaning in *Chicksaw Nation* appeared in an illustrative parenthetical. *See  id.* at 90 (emphasizing that the words "chapter 35" appeared in a parenthetical phrase and that "[t]he use of parentheses emphasizes the fact that that which is within is meant simply to be illustrative, hence redundant"); *id.* at 89-90 (finding that "the language outside the parenthetical is unambiguous," and "too strong to bend as the Tribes would wish—*i.e.*, so that it gives the chapter 35 reference independent operative effect," without "seriously rewriting the language of the rest of the statute" or resorting to a construction "far too convoluted to believe Congress intended it"); *id.* at 91 (noting that the legislative history of the provision at issue "on balance supports our conclusion."). Here, in contrast, the language that would be disregarded if we did not adopt our reading is not a single example in an arguably illustrative parenthetical, but rather an entire subsection—one that employs mandatory language and thus suggests on its own terms that it was intended to have substantive meaning. *See* 5 U.S.C. § 5538(b)(2) ("the period during which an employee is entitled to reemployment rights under chapter 43 of title 38 . . . (B) shall include any period of time specified in section 4312(e) of title 38"). There is nothing in the text to indicate that Congress intended subsection (b)(2)(B) to be merely illustrative, or otherwise ineffectual. We therefore do not believe that the provision at issue here is one that may be treated as void, in contravention of the ordinary rule that no portion of a statute should be treated as "inoperative or superfluous, void or insignificant." *Corley*, 129 S. Ct. at 1566.

We also do not think that the inclusion of subsection (b)(2)(B) can be viewed as "the result of obvious mistake or error." *See* 2A Singer, Statutory Construction § 46:6. So far as we have been able to discern, all but one of the precursors to the bill originally enacted as section 5538, dating back as far as 2001, included subsection (b)(2)(B), cast in similar or even identical terms. *See*, *e.g.*, H.R. 3337, 107th Cong. (introduced Nov. 16, 2001); S. 1818, 107th Cong. (introduced Dec. 13, 2001). The only exception of which we are aware was H.R. 4247, introduced in 2007. It too would have provided for reservist differential pay following the

completion of active service, even though, unlike subsection (b)(2)(B), it did not expressly reference USERRA's reemployment rights provisions to define the scope of that coverage.[8] Moreover, we know of no precedent for treating such a lengthy statutory phrase as the product of mere inadvertence or error. We would be particularly reluctant to accord such treatment to subsection (b)(2)(B) because the text of section 5538 suggests that the drafters viewed subsections (a) and (b)—including subsection (b)(2)(B)—as parts of an integrated whole that defined the benefit that Congress intended to confer. Subsection (a) expressly cross-references subsection (b) in describing the period for which employees will be entitled to receive reservist differential pay; subsection (b)(2)(B) clarifies that the period "during which such employee is entitled to reemployment rights under chapter 43 of title 38," as that phrase is used in subsection (b)(1)(A), "shall include any period of time" "within which an employee may report or apply for employment or reemployment rights following completion of service on active duty"; and subsection (b)(2)(B) expressly refers back to subsection (a)'s "call or order to active duty" requirement. In view of these circumstances, we are not persuaded that the inclusion of subsection (b)(2)(B) could be reasonably viewed as the result of inadvertence. The better course, we think, is to accord meaning to that subsection, in keeping with its plain terms.

We are aware of the argument that the statute should not be so construed because it is doubtful that Congress would have intended that "reservist differential pay would continue during periods in which the [covered employee] is not serving on active duty and not receiving military pay," particularly given that subsection (a) of the statute defines the amount of the reservist differential as an "amount equal to the amount by which [a covered employee's] basic pay . . . exceeds [the covered employee's] military pay and allowances." *See* DoD Letter (emphasis removed) (citing 5 U.S.C. § 5538(a)). We acknowledge that the statute does not expressly contemplate that the amount of military pay and allowances allocable to a particular pay period might be zero: subsection (a) refers to "*the* amount of pay and allowances" allocable to a given pay period, not, for example, "the amount, *if any*, of pay and allowances" allocable to a given period. *See* 5 U.S.C. § 5538(a)(2); *cf. id.* § 5538(a)(1) (referring to the amount, "if at all," by which basic pay exceeds military pay for a given pay period). But reservist differential pay may still be calculated under subsection (a) even if military pay and allowances are zero. And this argument with respect to subsection (a) does not indicate any alternate way of giving meaning to subsection (b)(2)(B)—the difficulty that, as discussed above, necessitates our approach.

The interpretation set forth above, moreover, is consistent with the overall purpose of the statutory scheme—to prevent federal employees from suffering a reduction in pay and thereby incurring a financial burden in the performance of active duty pursuant to one of the referenced statutory provisions. *See* 5 U.S.C. § 5538(a); *cf.* 149 Cong. Rec. 5764 (2003) (statement of Sen. Durbin, introducing a prior version of section 5538) ("I would like to discuss the financial burden faced by many of the men and women who serve in the military Reserves or National Guard and who are forced to take unpaid leave from their jobs when called to active duty . . .

---

[8]  *See* H.R. 4247, 110 Cong., § 4(b)(1), (introduced Nov. 15, 2007) (providing for reservist differential pay "(A) while the employee serves on active duty for a period of more than 30 days; (B) while the employee is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, the performance of such active duty; or (C) during the 14-day period beginning at the end of such active duty or the end of the period referred to in subparagraph (B).").

It is unfair to ask the men and women who have volunteered to serve their country . . . to also face a financial strain on their families."). Section 5538's reference to USERRA to determine the pay periods during which reservist pay is available is consistent with this objective. USERRA operates to "minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers." 38 U.S.C. § 4301(a) (2006). As the House Report accompanying USERRA states, Congress included a reemployment period after uniformed service because "[o]ne of the basic purposes of the reemployment statute is to maintain the servicemember's civilian job as an 'unburned bridge.'" H.R. Rep. No. 103-65, at 26 (1993). The period ensures that servicemembers are "not pressed for a decision immediately on [their] discharge, but ha[ve] the opportunity to make plans for the future and readjust [themselves] to civilian life." *Id.* (quoting *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284 (1946)). Accordingly, it is entirely consistent with Congress's objective to mitigate the financial burden of those called to active duty to provide, when the term of active duty ends, reservist differential pay during their period of statutory readjustment to civilian life— a period during which they could otherwise have remained gainfully employed at their original government job had they not been ordered to active duty.

For the reasons discussed above, we think the better reading of section 5538, viewed as a whole, would permit eligible employees to receive differential pay in accordance with the plain language of subsection (b)(2)(B). That reading is also consistent with and gains support from the interpretive canon that "provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220 n.9 (1991) (interpreting a provision of the Veterans' Reemployment Rights Act, a USERRA precursor); *see also*, *e.g.*, *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946) ("This legislation [the Selective Training and Service Act of 1940] is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need.").

**B.**

In our view, neither the pre-enactment nor post-enactment legislative history of section 5538 offers much aid in interpreting the original text. Beginning in about 2001, numerous measures were introduced in both Houses of Congress regarding reservist differential pay. Many of these bills were phrased in terms very similar to the bill first enacted as section 5538. However, there were significant differences in certain bills. For example, the earliest bills omitted the phrase "while serving on active duty," from subsection (a), thus providing simply that that eligible federal employees would be "entitled to receive" a reservist differential "for each pay period described in subsection (b)"—a subsection that, in each case, included the language eventually enacted as subsection (b)(2)(B). *See*, *e.g.*, H.R. 3337, 107th Cong. (introduced Nov. 16, 2001); S. 1818, 107th Cong. (introduced Dec. 13, 2001); H.R. 217, 108th Cong. (introduced Jan. 7, 2003). If such a bill had been adopted by Congress, the apparent tension in the pre-amendment text of subsections (a) and (b) of section 5538 would not have been presented. That tension first emerged in 2003. *See* S. 593, 108th Cong. (introduced March 11, 2003). As originally introduced, S. 593 did not contain the phrase "while serving on active duty" in subsection (a). That phrase was added in committee, in the same place it appears in the first-enacted version of subsection (a). *See* S. 593 (as reported out of the Committee on Governmental Affairs on November 16, 2004). Notably, however, the conference report for the

9

amended S. 593 does not list the addition of the phrase "while serving on active duty" as among the changes made to the bill, or discuss the intended interplay between subsections (a) and (b). *See* S. Rep. No. 108-409 (Nov. 16, 2004).

It appears that nearly every bill subsequently introduced regarding reservist differential pay incorporated both the phrase "while serving on active duty" in subsection (a) and the phrase "following completion of service on active duty" in subsection (b)(2)(B), just as did the bill that ultimately became law. *See*, *e.g.*, S. 989, 109th Cong. (introduced May 10, 2005); H.R. 5525, 109th Cong. (introduced June 6, 2006); S. 3260 ("Financial Services and General Government Appropriations Act, 2009"), 110th Cong., § 750(a) (introduced July 14, 2008). *But see* H.R. 4247, 110th Cong., § 4 (introduced Nov. 15, 2007) (omitting the "while serving on active duty" language from subsection (a) and providing in subsection (b) that reservist differential payments would be due "(A) while the employee serves on active duty for a period of more than 30 days; (B) while the employee is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, the performance of such active duty; or (C) during the 14-day period beginning at the end of such active duty or the end of the period referred to in subparagraph (B)."). We are not aware of any legislative history of any of these predecessor bills that illuminates the question you have asked.

The legislative history of the original enactment similarly sheds little light on congressional intent. Section 5538 was passed as part of an omnibus appropriations bill, and it appears that the only mention of this statute in the legislative history is contained in an explanatory statement submitted by Representative Obey. *See* 155 Cong. Rec. 2704 (daily ed. Feb. 23, 2009). That statement says, simply, that "Section 751 provides for nonreduction in pay for Federal employees while serving in the uniformed services or National Guard."

There have been some significant post-enactment developments, although we ultimately do not believe that Congress's subsequent actions in this area provide clear direction as to its purpose in enacting the original statute. *Cf. Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (cautioning that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress") (internal quotation marks omitted). As we previously noted, Congress amended section 5538 in December 2009, nine months after it was originally enacted. Both OPM and DoD have expressed the view, on which we offer no opinion, that, as revised, section 5538 no longer permits employees to receive reservist differential pay during the period after active service during which they continue to enjoy reemployment rights. *See* http://www.opm.gov/reservist/guidance/qualifying.asp. In some circumstances, when "a former statute is amended, or a doubtful meaning clarified by subsequent legislation, such amendment or subsequent legislation is strong evidence of the legislative intent of the first statute." 2A Singer, Statutory Construction § 49:11; *see also Bailey v. Clark*, 88 U.S. 284, 288 (1874) (statutory amendment "was evidently intended to remove any doubt previously existing as to the meaning of the statute and declare its true construction and meaning"); *Brown v. Marquette Sav. & Loan Ass'n*, 686 F.2d 608, 615 (7th Cir. 1982) (same); *Porter v. Comm'r of Internal Revenue*, 856 F.2d 1205, 1209 (8th Cir. 1988) ("Amending legislation is perceived as clarifying, not changing, an original statute's intended meaning when a conflict of statutory interpretation has arisen.").

However, a statutory amendment does not invariably mean that the revised statute and the original statute share a common meaning. To the contrary, the Supreme Court has acknowledged a "canon of statutory construction requiring a change in language to be read, if possible, to have some effect," *Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 263 (1992), and has stated that "[t]he deliberate selection of language . . . differing from that used in the earlier acts indicates that a change of law was intended." *Brewster v. Gage*, 280 U.S. 327, 337 (1930) ("There is no support for the suggestion that subdivision (5) expressed the meaning, or was intended to govern or affect the construction, of the earlier statutes."); *see also* 2A Singer, Statutory Construction § 49:11 ("A number of cases have held that where an act is amended or changed so that doubtful meaning is resolved such action constitutes evidence that the previous statue meant the contrary."). Accordingly, the significance of a statutory revision—*i.e.*, whether it clarifies the original statute, or amends it—is appropriately determined by reference to the text of the amendment and the context surrounding its adoption. *See*, *e.g.*, *S.G.*, 505 U.S. at 263-64 n.15 (relying on an absence of any indication in the "Advisory Report, the document both Houses of Congress acknowledged as the source for the amendment," in rejecting the view that the amendment was intended merely to clarify "the Red Cross's clear preamendment capacity to sue in federal court" rather than amend the law); *Barnes v. Cohen*, 749 F.2d 1009, 1015-16 (3d Cir. 1984) (determining in light of legislative history and a subsequent agency interpretation that Congress's purpose in amending an ambiguous statute was to provide "'clarification' rather than a 'change.'").

Here, there is no clear textual indication that the amendment was meant to explain the meaning of the existing statute, rather than modify its meaning—indeed, the statute itself is simply silent on that point. It is true that the conference report described the amendment as a "technical correction" to the existing law, *see* H.R. Conf. Rep. No. 111-366, at 946 (2009), and that, in some instances, the phrase "technical correction" is used to denote that Congress does not intend to make a substantive change to an existing provision. *See*, *e.g.*, *North Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 97 (D.C. Cir. 1999) (where statutory amendment "was styled a 'technical correction,'" "only clarification and not substantive change was intended"); *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.*, 177 F.3d 1204, 1211 (11th Cir. 1999) ("While the text of the corrections does not explicitly tell us whether the additions and subtractions constitute new law, their designation as technical corrections tends to indicate that they were merely changes meant to clarify existing law."); *In re Chateaugay Corp.*, 89 F.3d 942, 954 (2d Cir. 1996) ("By labelling the 1994 change a 'technical correction,' Congress recognized that the [prior] amendment did not purport to change the substantive meaning of the law."). However, courts have also recognized that such labels are not determinative of a statute's meaning and that amendments described by Congress as "technical" sometimes make significant changes in existing law. *See, e.g., Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S. Ct. 1396, 1407-08 (2010) ("Significant substantive changes—including the introduction of the term we are construing in this case—were inserted without floor debate, as 'technical' amendments."); *United States v. R.L.C.*, 503 U.S. 291, 305 n.5 (1992) ("The dissent takes us to task for reliance upon a 'technical amendment.' But a statute is a statute, whatever its label."); *Public Employees Ret. Bd. v. Shalala*, 153 F.3d 1160, 1162 (10th Cir. 1998) ("Congress did not consider the 1984 change to be dramatic, labeling the amendment a technical correction. Nonetheless, that technical correction has become very important" because it made certain retirement plan contributions subject to FICA taxes); *cf. H.R. 3658, H.R. 8321, and Related*

*Bills, Congressional Review of Administrative Rulemaking:  Hearing Before the Subcommittee on Administrative Law and Governmental Relations of the H. Committee on the Judiciary*, 94th Cong., 376 (1975) (Statement of Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, Dept. of Justice) ("Presidents have sometimes vetoed 'clarifying' legislation on the grounds that, in their view, the amendment did not clarify but vitiated the intent of the original act.").  Accordingly, the mere fact that the committee labeled this change a "technical correction" does not establish that it was intended to clarify the statute's meaning, rather than amend it.

### III.

Taken as a whole, and giving effect to each of its provisions, the text of section 5538 prior to its recent amendment is consistent with the view that the entitlement to reservist differential pay extends to the period following the completion of active duty service during which a returning reservist may apply or report for reemployment at his or her civilian workplace.  Accordingly, we conclude that the pre-amendment version of section 5538 entitled federal employees to receive reservist differential pay during "any period of time specified in section 4312(e) of title 38 within which an employee may report or apply for employment or reemployment following completion of service on active duty."  5 U.S.C. § 5538(b)(2)(B).

/s/

JEANNIE S. RHEE
Deputy Assistant Attorney General